MARK PLAGER (SBN: 192259)
mark@plagerschack.com
MICHAEL SCHACK (SBN:  128784)
michaels@plagerschack.com
MICHAEL O'BRIEN (SBN: 269193)
mobrien@plagerschack.com
PLAGER SCHACK LLP
16152 Beach Blvd., Suite 207
Huntington Beach, CA  92647
Telephone:  (714) 698-0601
Facsimile:  (714) 698-0608

Attorneys for Defendant
AESTHETIC SKIN SYSTEMS LLC

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA- WESTERN DIVISION**

| | |
|---|---|
| EDGE SYSTEMS LLC, a California limited liability company, and AXIA MEDSCIENCE, LLC, a Delaware limited liability company,<br><br>                    Plaintiffs,<br><br>        v.<br><br>AESTHETIC SKIN SYSTEMS LLC, a California limited liability company<br><br>                    Defendants. | CASE NO.: 2:17-cv-04597<br><br>**DEFENDANT AESTHETIC SKIN SYSTEMS LLC'S MEMORANDUM IN SUPPORT OF ITS OPENING CLAIM CONSTRUCTION BRIEF** |

*/ / /*
*/ / /*
*/ / /*
*/ / /*
*/ / /*
*/ / /*
*/ / /*

*PLAGER SCHACK LLP*
*16152 Beach Boulevard, Suite 207*
*Huntington Beach, CA  92647*

**TABLE OF CONTENTS**

**PAGE NO.**

I.    INTRODUCTION………………………………………………..…....2

II.    THE CLAIM TERMS AT ISSUE MUST BE CONSTRUED IN ACCORDANCE WITH THE PROSECUTION HISTORY………………..3

III.    DEFENDANT'S CLAIM TERM INTERPRETATIONS…………………..4

    A.    U.S. Patent No. 6,641,591………………………………………4

        1.    Claim 1……………………………………………..….4

        2.    Claim 4………………………………………….……….5

        3.    Claim 10……………………………………..…....…….6

    B.    U.S. Patent No. 7,678,120……………………………………...7

        4.    Claim 1 – First Contested Claim Term……..……………7

        5.    Claim 1 – Second Contested Claim Term……....…………8

    C.    U.S. Patent No. 7,789,886………………………………….…8

        6.    Claim 1 – First Contested Claim Term……..……………8

        7.    Claim 1 – Second Contested Claim Term……....………...9

        8.    Claim 11………………….…………………..…...10

    D.    U.S. Patent No. 8,048,089…………………………………11

        9.    Claim 1 – First Contested Claim Term ………………....….11

        10.  Claim 1 – Second Contested Claim Term…………….…….12

        11.  Claim 1 – Third Contested Claim Term…..…....……………13

    E.    U.S. Patent No. 8,066,716………………………………….14

        12.  Claim 1 – First Contested Claim Term……..…………….15

        13.  Claim 1 – Second Contested Claim Term………..………16

        14.  Claim 11………………….…..........…....………… 17

    F.    U.S. Patent No. 8,337,513………………………………17

        15.  Claim 1…………………………………………17

        16.  Claim 10……………………………….…...……….....18

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA  92647

**TABLE OF CONTENTS**
*(con't)*

**PAGE NO.**

G.   U.S. Patent No. 9,468,464……………………………………………..19

    17.  Claim 1..……………………….............…....…………..19

    18.  Claim 12…………………………………......………….....21

H.   U.S. Patent No. 9,550,052……………………………….…21

IV.   CONCLUSION………………………………………………....22

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA  92647

# TABLE OF AUTHORITIES

**PAGE NO.**

## CASES

*Bausch & Lomb Surgical, Inc. v. Oasis Medical, Inc.*
   2001 U.S. Dist. LEXIS 25880 (C.D. Cal., Jul. 16, 2001)…………………...14

*Ethicon Endo-Surgery v. Tyco Healthcare Group LP*
   2006 U.S. Dist. LEXIS     51187 (S.D. Ohio, July 26, 2006)………………12

*EZ Dock, Inc. v. Schafer Systems, Inc.*, et al.
   2003 U.S. Dist. LEXIS 1810 (D. Minn., Jan. 22, 2003)……………………12

*Festo Corp. v Shoketsu Kinzoku Kogyo Kabushiki Co.*
   535 U.S. 722 (2002)……………………………...…………………….11, 18

*Hakim v. Cannon Avent Group, PLC*
    479 F.3d 1313, 1317-1318 (Fed. Cir. 2007)……… …...4, 7, 8, 15, 17, 19, 21

*Karlin Tech. Inc. v. Surgical Dynamics Inc.*
   177 F.3d 968, 50 USPQ2d 1465 (Fed. Cir. 1999)……………...... ………..13

*Phillips v. AWH Corp.*
   415 F.3d 1303, 1312-13, 1315, 1316, 1317, 1318, 1323-24
   (Fed. Cir. 2005)(en banc)………………………………………………….3, 4

## CALIFORNIA STATUTES

16 Cal. Code Reg. 984(e)…………………………………………………..2

## FEDERAL STATUTES

35 U.S.C. 112(b)……..………………………………………………………10

## OTHER AUTHORITIES

Manuel of Patent Examination Procedure, 2173.05(B)…………………….12

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA  92647

Defendant Aesthetic Skin Systems LLC, submits this memorandum of points and authorities in support of its Opening Claim Construction.

## I.    BACKGROUND

This is a case about machines (and parts of machines) that are used in hydrodermabrasion. Hydrodermabrasion is a technique for removing skin layers to have new layers grow in their place.  In the late 1990's hydrodermabrasion was an invasive procedure performed exclusively by physicians.   Years later, a less invasive version of this procedure became available for estheticians to perform. The line between medical practice performed by a physician and cosmetic practice performed by an esthetician is that, "No [esthetician] shall perform services upon a surface of the skin or scalp where such skin is inflamed or broken (e.g., abraded, cut), or where a skin infection or eruption is present." 16 Cal. Code Reg. 984(e). Physicians can inflame, break, abrade, and cut skin whereas estheticians engage in superficial exfoliation.   Anatomically, the difference is that physicians can tear skin down to the stratum corneum but estheticians cannot do so. (Declaration of Nathaniel Coleman at ¶ 17)(Hereinafter "Coleman Decl.").

Resolution of the case would greatly benefit from construction of two words that reappear throughout the claim construction terms: abrade and sharp.  Most of the briefing below focuses on those two terms in over a dozen contexts.

There are two families of patents at issue in this case.  U.S. Patent 6,641,591 ("the '591 patent") is the first patent of the "Shadduck patents."  (Exhibit A).  U.S. Patent 7,789,886 ("the '886 patent") comes from a continuation application of the '591 patent.  (Exhibit G).  U.S. Patent 7,678,120 ("the '120 patent") comes from a continuation application of the '886 patent.  (Exhibit E).   U.S. Patent 8,066,716 ("the '716 patent") also comes from a continuation application of the '886 patent. (Exhibit O).  U.S. Patent 8,337,513 ("the '513 patent") comes from a divisional application of the '886 patent. (Exhibit R). U.S. Patent 9,468,464 ("the '464 patent") comes from a continuation application of U.S. Patent Application

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA  92647

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
OPENING CLAIM CONSTRUCTION BRIEF**

1   13/620,164 ("the '164 application") which is currently pending.  (Exhibit T). The

2   '164 application is a continuation of '513 patent and is not a part of this litigation.

3       U.S. Patent 8,048,089 ("the '089 patent) is the first patent in the "Ignon

4   patents." (Exhibit K). U.S. Patent 9,550,052 comes from a continuation application

5   of U.S. Patent 9,474,886 which is not asserted in the present litigation.  U.S. Patent

6   9,474,886 comes from a continuation application of the '089 patent. (Exhibit W).

7   **II.    THE CLAIM TERMS AT ISSUE MUST BE CONSTRUED IN**

8   **ACCORDANCE WITH THE PROSECUTION HISTORY**

9       Claim terms "are generally given their ordinary and customary meaning,"

10  which is "the meaning that the term would have to a person of ordinary skill in the

11  art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303,

12  1312-13 (Fed. Cir. 2005) (en banc) (citations omitted). To determine this meaning,

13  "the court starts the decision making process by reviewing the same resources as

14  would that person, viz., the patent specification and prosecution history." *Id.*.

15      Claims "must be read in view of the specification, of which they are a part."

16  *Id.* at 1315 (citation omitted). The specification "is always highly relevant to the

17  claim construction analysis. Usually, it is dispositive; it is the single best guide to

18  the meaning of a disputed term." *Id.* (citation omitted). "[T]he specification may

19  reveal a special definition given to a claim term by the patentee that differs from

20  the meaning it would otherwise possess. In such cases, the inventor's lexicography

21  governs." *Id.* at 1316. In reviewing the specification, a court should strive to

22  capture the scope of the actual invention and not allow the claim language to

23  become divorced from what the specification conveys is the invention. *Id.* at

24  1323-24.

25      A court "should also consider the patent's prosecution history, if it is in

26  evidence." *Phillips*, *supra*, 415 F.3d at 1317 (citation omitted). "[T]he prosecution

27  history can often inform the meaning of the claim language by demonstrating how

28  the inventor understood the invention and whether the inventor limited the

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA  92647

3

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA 92647

invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

Additionally, a court may rely on extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* (citation omitted). Technical dictionaries may be especially useful to help a court "better understand the underlying technology and the way in which one of skill in the art might use the claim terms." *Id.* at 1318 (citation omitted). In addition, expert testimony may "provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id*

Furthermore, based upon the doctrine of prosecution disclaimer, an applicant cannot recapture claim scope that was surrendered or disclaimed during prosecution of a parent application unless the prosecution history is sufficiently clear to inform the examiner that the previous disclaimer, and the prior art that it was made to avoid, may need to be revisited.  *See Hakim v. Cannon Avent Group, PLC,* 479 F.3d 1313, 1317-1318 (Fed. Cir. 2007).

## III.    DEFENDANT'S CLAIM TERM INTERPRETATIONS

### A.    <u>U.S. Patent No. 6,641,591</u>

The '591 patent is an original non-provisional application.

#### 1.    Claim 1

The limitation, "an abrading structure with substantially sharp edges for abrading tissue" should be interpreted to mean, "There are at least two edges that come together with a sharp margin of intersection to form a cutting edge that tear skin as if done by teeth…."

/ / /

/ / /

In prosecution, the "abrading structure" was defined by the examiner as anything that could remove skin (Exhibit B, at 95). The examiner indicated that this element was found in U.S. Patent 6,139,554 issued to Maurice Karkar (the "'554 patent", Exhibit C). The '554 patent taught a tip with hole through a conical end. The examiner reasoned that rubbing a flat surface with a hole over skin would remove some skin. (Exhibit C, at 44-45). The applicant responded that the present invention removed even more skin than the '554 patent because the claimed invention used "an instrument with a working surface that carries sharp-edged apices in a rasp-like or sandpaper-like structure." (Id., at 96).

The term, "substantially sharp edges" thus means "at least two edges that come together with a sharp margin of intersection to form a cutting edge" which is very close to the definition described in the file history. The term, "for abrading tissue" can be found in the specification of the '591 patent at Col. 5, ln, 64-66, ("these primary surface elements 255a and secondary surface elements thereby define teeth 65 therebetween that seem well suited to abrading skin layers....") The term refers to tearing skin with teeth. (Exhibit A, at 13).

Plaintiffs' proposed construction is anticipated by the '554 patent. The plaintiff stated in the file history that the claimed invention is different than the '554 patent, so plaintiffs' definition is not a precise as the one proffered by the Defendant. Coleman Decl., ¶ 10).

### 2. Claim 4

The claim term, "shape irregularities comprising distally projecting apices and recessed portions therebetween" should be constructed to mean, "a first apex is formed from two edges that terminate at a first point extended above the skin interface portion. A second apex is formed by two additional edges that terminate at a second point extended above the skin interface portion. A recessed portion is between the first apex and the second apex."

/ / /

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA  92647

Mr. Coleman explains that "an apex is something that rises to a point.  To rise to a point, an apex needs two edges."  Coleman Decl., ¶ 12.  If there are at least two apexes, there needs to be at least four edges.  The prosecution history points out that "edges" means "sharp edges" in this context. (Exhibit A, at 95).

The plaintiff would prefer to use the construction of, "a ridged surface having peaks that extend upward with valleys between them…."  However, this construction can include rounded peaks, and the only peaks described in the application are sharp peaks made from two sharp edges.  Coleman Decl., ¶ 13-14.  Plaintiffs' proposed definition conspicuously omits to the invasive procedure being taught by the specification.

### 3.    Claim 10

The claim term, "the combination of an abrasive structure carried by the treatment device and the flowable treatment medium removes dermal tissue" should be constructed to mean "A structure on the treatment device that inflames, breaks, irritates or cuts the skin located below the epidermis beyond the reach of an esthetician that is conducting a superficial exfoliation.  The skin located below the epidermis is then removed by the treatment medium."

As noted above, "an abrasive structure" is "a structure on the treatment device that inflames, breaks, irritates or cuts the skin located below the epidermis beyond the reach of an esthetician that is conducting a superficial exfoliation." This abrasive structure then tears through the stratum cornum and removes skin from below the stratum cornum which is then washed away with the treatment medium.  Coleman Decl., ¶ 17.

Plaintiffs proffer that a better claim construction would be, "an abrasive structure on the treatment device and the flow of treatment medium at the treatment region work together to remove dermal tissue…."  However, Mr. Coleman notes plaintiffs' claims construction is inconsistent with the specification because the specification details a two-step process of (1) teeth tearing away a

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA  92647

DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
OPENING CLAIM CONSTRUCTION BRIEF

meaningful amount of skin tissue, and (2) washing the torn skin away. *Id.* In comparison, Defendant's definition comports with the specification.

**B.   U.S. Patent No. 7,678,120**

The '120 patent is a continuation of both the '886 patent and the '591 patent. (Exhibit E, p. 12, col 1. ln 9-10). The applicant explains in the file history that, "Applicant notes for the record that the claims of the present application are different and may be broader in scope than the claims in any related patent or application. To the extent that any statements made in a related case (such as amendments or characterizations regarding the scope of a claim or prior art) could be construed as a disclaimer of any subject matter supported by the present disclosure, Applicant rescinds and retracts such disclaimer." (Exhibit F, at 79). This is impermissible recapture under *Hakim*, 479 F.3d, at 1317-1318.  In *Hakim* the Federal Circuit noted that arguments and previous waivers of claimed material narrowed in view of art cited by the examiner must be *specifically* disclaimed. Like in Hakim, *supra*, the attorney filed a letter stating that claims were being broadened in the child application, and, therefore, required further examination. However, there was no discussion of specific prior art or arguments previously used in the attorney's letter to the examiner. *Hakim,* 479 F.3d at 1318 ("A patentee may not state during prosecution that the claims do not cover a particular device and then change position and later sue a party who makes that same device for infringement.").   Accordingly, all previous narrowing amendments remain in effect.

**4.    Claim 1 – First Contested Claim Term**

The claim term, "an abrading surface on a skin interface on the working end of the skin treatment device" should be constructed to mean, "A structure on a skin interface on the working end of the skin treatment device that inflames, breaks, irritates or cuts the skin located below the epidermis beyond the reach of an esthetician that is conducting a superficial exfoliation…" for substantially the same

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA  92647

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
OPENING CLAIM CONSTRUCTION BRIEF**

reasons discussed above.   Plaintiffs' construction is inadequate for the same reasons discussed above in Section IV.A1 regarding "the abrasive structure."

### 5.   Claim 1 – Second Contested Claim Term

The claim term, "the abrading surface comprising apexes extending upwardly from the abrading surface and the apexes having sharp edges" should be constructed to mean, "a first apex is formed from two sharp edges that terminate at a first point extended above the skin interface portion. A second apex is formed by two sharp edges that terminate at a second point extended above the skin interface portion. A recessed portion is between the first apex and the second apex…."

In addition to the reasons cited above in section IV.A.2, the examiner explains during prosecution, "the prior art of reference does not disclose a method for abrading skin of a patient with a device comprising a suction source and especially [an] abrading surface comprising apexes having *sharp* edges extending upwardly from the abrading surface." (Exhibit F, p. 35-37).  Mr. Coleman keenly points out that the requirement of "sharp" edges actually makes this claim term narrower than that found in the '120 application. Coleman Decl., ¶ 23.

### C.   <u>U.S. Patent No. 7,789,886</u>

The '886 patent is a continuation of '591 patent and makes the same impermissible recapture attempt as the '120 patent.  (Exhibit H, p. 63-63).  All of the waivers and limitations of the '120 patent's file history apply to the '886 patent as well. *Hakim*, 479 F.3d at 1317-1318.

### 6.   Claim 1 – First Contested Term

The claim term, "an abrading structure comprising a plurality of sharp elements for engaging and abrading the skin surface" should be constructed to be, "A structure that inflames, breaks, irritates or cuts the skin located below the epidermis beyond the reach of an esthetician that is conducting a superficial exfoliation; at least two sharp elements.  Each sharp element has a sharp margin of intersection to form a cutting edge that tears skin as if done by teeth…."

The scope of the '886 Patent was narrowed twice. First, in response to the '591 patent, the applicant argued that a bored hole failed to abrade skin in the same manner as a rasp or sand paper. *Supra*. Further, the applicant again narrowed the '886 patent in response to assertion of U.S. Patent 6,423,078 issued to Medtronic Xomed, Inc. (the "078 patent", Exhibit I) which teaches a tip covered with an abrasive surface. (Exhibit I, p. 6 ln. 66-67). The applicant traversed these references by narrowing the claim with the addition of "a plurality of sharp elements" on the working end. (Exhibit H, p. 57). As Mr. Coleman explains, "Unlike, the '120 patent, the "sandpaper" argument does not appear in the file history of the '886 patent because [the '078 patent] is teaching just that, so the sharp elements here are more narrowly defined than those of the '120 patent." Coleman Decl., ¶ 26).

It follows that the claim construction of the '886 patent needs to be narrower than that of the '591 patent based upon its amendments during prosecution. Interpreting the claim to include "Each sharp element has a sharp margin of intersection to form a cutting edge that tears skin as if done by teeth" resolved anticipation in view of the '078 patent. Mr. Coleman did not believe that the plaintiffs' construction accomplished this stating, "This definition is too broad and reads on the Bays reference. Simply being sufficiently sharp enough to abrade skin is what Bays is teaching. The more appropriate contextual definition accounts for the point of novelty described by the examiner in the file history." Coleman Decl., ¶ 28.

### 7.    Claim 1 – Second Contested Term

The claim term, "at least one aperture about said working surface" should be constructed to mean, "at least one aperture is on every side of or all the way around the working surface." The plaintiff proposes the construction, "at least one aperture [is] in or near the working surface…." This is a disagreement about whether "about" means "on every side of or all the way around" or "in or near." Both of

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA 92647

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
OPENING CLAIM CONSTRUCTION BRIEF**

these definitions can be found in the COLLINS ENGLISH DICTIONARY (2016). (Exhibit J, p. 3-4).

When a claim term is capable of having two different meanings that are structurally different then the claim term is undefined, thus the claim fails for indefiniteness under 35 U.S.C. 112(b). The term "about" is used primarily in the '886 Patent describing approximations regarding measurements and the like. In one use, the specification describes that "the inner periphery [is] about the edge of opening 26", meaning that the inner periphery surrounds or is all the way around the central opening 26 (vacuum opening in this case), fitting the defendant's definition. (Exhibit G, at 14, col. 5, ln. 32-36). The specification does not use the term "about" when describing the location of the vacuum apertures in relation to the working surface. In fact, the term "working surface" is not found in the specification, nor anywhere in the parent application. In the embodiment of the '886 patent shown in Fig. 8, ports 250 surround the skin interface 225 and the port 240. (Id. at 10).  As an option with this embodiment, "the vacuum source and fluid source may be reversed between the first and second aperture arrangements 240 and 250 with the method of skin removal still working well." (Id., p. 15 col. 7, ln. 44-48). Thus, in this embodiment, the vacuum apertures 250 are situated "on every side of" and are "near or close to" the skin interface 225. (Id.). Thus, the exact claimed positional relationship between the working surface and the at least one aperture is uncertain rendering the claim indefinite and invalid pursuant 35 U.S.C. §112(b).

### 8.    Claim 11

The claim element, "an abrasive structure configured to abrade the skin surface" should be construed to mean, "a structure that inflames, breaks, irritates or cuts the skin located below the epidermis beyond the reach of an esthetician that is conducting a superficial exfoliation."  This definition is support by all the reasons stated above in Section IV.A.1.

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA  92647

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA  92647

The plaintiff has proposed the construction "an abrasive structure that is arranged in a way that will allow it to abrade the skin surface…."  However, this definition and scope was already surrendered by the applicant during prosecution. *See Festo Corp. v Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722 (2002). See* Exhibit H at 56-65.

**D.      U.S. Patent No. 8,048,089**

The '089 patent is an original non-provisional application.

### 9.      Claim 1 – First Claim Term

The claim term, "an outer member extending around a periphery of the distal face, said outer member defining an inner area" should be constructed to be, "the distal face has a circumferential outer edge that defines an inner area…."

As Mr. Coleman explains, "The file history at page 98 notes that the language 'outer member' was selected to stay consistent with the specification. The specification at column 9 lines 10-14 reads, 'With respect to FIGS. 5A through 7, the tip 34 comprises an outer member 120 and an inner member 124. The outer member 120 preferably defines the periphery of the distal end 102 of the tip



34.' Figure 5A is shown [above].  This shows the outer edge defines an inner area of the tip." Coleman Decl., ¶ 32; Exhibit L, p. 96; Exhibit K, p. 8, p.32 col. 9 ln. 10-14).

The plaintiffs' construction is not consistent with the specification and Figure 5A.  Figure 5A shows that the raised edge portion 120 is set inward from the tip main body 66.  (Exhibit K, p. 8, p.32 col. 9 ln. 10-14).  The plaintiffs' construction is contrary to the express language used by the applicant in the specification.

/ / /

11

### 10.    Claim 1 – Second Claim Term

The claim term, "a protruding member extending in a generally spiral fashion across at least a portion of the inner area of the distal face, the protruding member defining a channel between the at least one first passage and the at least one second passage" should be constructed to mean, "a curved member that winds around a fixed center point increasing or decreasing distance from the point across at least a portion of the inner area of the distal face, the curved member defines a channel situated within the space separating the first passage and the second passage, but not necessarily connecting the two."

The term "generally" is a term of degree which, if definite, that modifies "spiral" to significantly broaden the scope of the term. See MPEP, 2173.05(B). Courts have construed the term "generally" when modifying a shape. For example, in *EZ Dock*, the limitation "generally frustoconically shaped pylon" was construed as meaning "a structure that, for the most part, is in the shape of the frustum of a solid having (1) a closed plane base and (2) a surface formed by line segments joining every point of the boundary of the base to a common vertex." *EZ Dock, Inc. v. Schafer Systems, Inc.*, et al., 2003 U.S. Dist. LEXIS 1810 (D. Minn., Jan. 22, 2003). In *Ethicon Endo-Surgery*, the limitation "a generally hexagonal shape" was construed to "mean that the staple pocket is perceived by a viewer to have six major sides that can have varying lengths." *Ethicon Endo-Surgery v. Tyco Healthcare Group LP*, 2006 U.S. Dist. LEXIS 51187 (S.D. Ohio, July 26, 2006). Thus, a reasonable construction of a shape modified by the term of degree "generally" would not require a mathematically perfect shape but would be broadly limited by the definition of the shape.

Here, the specification does not include a special definition of spiral, and instead, broadly describes the range of spiral angles. "The spiral-like pattern of the inner members 124 in FIGS. 5 through 7 varies. … In some embodiments, the inner member 124 subtends an angle of about 70°, 135°, 180°, 210°, 225°, 270°,

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
OPENING CLAIM CONSTRUCTION BRIEF**

315°, 360°, and angles encompassing such ranges." (Exhibit K, p. 32, col. 9, ln. 30-41). Thus, the inner member or protruding member is not restricted to a full 360° spiral angle, and can be as little as 70° (and likely less). This means that the protruding member can be shaped as an arc of a spiral (basically a curve that fits the definition of a spiral), and is not limited to the commonly of a spiral (the Archimedean spiral, logarithmic spiral, etc.). *The American Heritage® Dictionary of the English Language*, Fifth Edition (2011) definition of the term "spiral" is "[a] curve on a plane that winds around a fixed center point at a continuously increasing or decreasing distance from the point." (Exhibit M at 3). However, since the term "generally" strips the term "spiral" of mathematical precision, the limitation "generally spiral fashion" should be construed as meaning "curve that winds around a fixed center point increasing or decreasing distance from the point".

Moreover, the limitation "generally spiral fashion" should not be narrowed to extend from a center portion of the distal face nor should it be narrowed to a particular spiral angle, since dependent claims 3, 4, and 5 recite these limitations. Under the doctrine of claim differentiation, there is a presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim *See Karlin Tech. Inc. v. Surgical Dynamics Inc.*, 177 F.3d 968, 50 USPQ2d 1465 (Fed. Cir. 1999). This prevents narrowing limitations from being imported into the independent claim, if that same limitation is found in claim that depends from the independent claim. Thus, the plaintiff should be held to the broad language chosen in prosecution.

### 11.   Claim 1 – Third Claim Term

The claim term, "at least one sharp edge configured to abrade skin tissue" should be constructed to mean, "a sharp margin of intersection that forms a cutting edge that inflames, breaks, irritates or cuts the skin located below the epidermis beyond the reach of an esthetician that is conducting a superficial exfoliation."

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA  92647

13

1    One of the repeating inquiries in this litigation is, "how sharp is sharp?" This

2    Court has previously defined, "a sharp, forward cutting edge" to mean, "having a

3    sharp margin of intersection between the top and bottom surfaces of the blade, in

4    which the surface border defined by that margin also defines the forward most

5    point of the blade." *Bausch & Lomb Surgical, Inc. v. Oasis Medical, Inc.*, 2001

6    U.S. Dist. LEXIS 25880 (C.D. Cal., Jul. 16, 2001).

7    The definition found in *Bausch & Lomb, supra,* fits well with the

8    prosecution history of the '089 patent. The file wrapper reads, "The closest prior

9    art of record is US 6,277,128 to Muldner which

10   discloses a skin abrasion device that includes a

11   spiral member (20, Figs. 1-2) extending

12   between two fluid passages (14 and 16, Figs. 1-

13   2). The spiral member taught by Muldner does

14   not have a sharp edge configured to abrade the

15   skin, instead an abrasive material travels



16   through the spiral member (20) taught by Muldner and this material is responsible

17   for abrading the skin. The examiner considers the protruding member claimed by

18   applicant to be a novel and unique feature." (Exhibit L, p. 25).    "Figure 1 of

19   Muldner is shown to the right.   Muldner explains, 'The abrasion chamber 12

20   shown is generally cylindrical with sidewalls 18 having generally helical or spiral

21   grooves and/or ridges 20.' Col. 2. Ln. 35-36.  So, a sharp edge is not merely an

22   edge or even a ridge, it must have something more." Colemam Decl., ¶ 38; Exhibit

23   N, at 8, col. 2. ln. 35-36. In that regard, the plaintiff's construction is too broad and

24   reads on Muldner rendering the claim unpatentable in view of Muldner.

25   **E.    U.S. Patent No. 8,066,716**

26   The '716 patent is a continuation of the'886 patent.  As noted above, the

27   '886 patent is a continuation of the '591 patent.  The '716 patent makes the same

28   impermissible recapture attempt as the '120 patent and the '886 patent. (Exhibit P,

p. 7-8).  All of the waivers and limitations of the file histories '591 patent and the '886 patent apply to the '716 patent as well. *Hakim*, 479 F.3d, at 1317-1318.

### 12.    Claim 1 – First Claim Term

The claim term, "an abrading structure" should be constructed to mean, "a structure that inflames, breaks, irritates or cuts the skin located below the epidermis beyond the reach of an esthetician that is conducting a superficial exfoliation."

During prosecution, the '716 application received a rejection based on U.S. Patent 6,162,232 issued to Shadduck. The examiner points out in the file history that, "body 8A (Shadduck-'232: C L 15-31) is qualified as an 'abrading structure'" configured to selectively abrade skin, because body 8A as shown in Fig. 3A above includes slot 41A to receive abrading structure 8B to abrade skin at an selective angle. Notice that an



FIG. 4

'abrading structure' only requires a structure, which somehow serves the purpose of abrading a skin." (Exhibit P, at 72).  To overcome this rejection the applicant added the limitation of a plurality of ridge elements.

The examiner concluded the ridge elements were unique and wrote, "Shadduck [referring to U.S. Patent 6,162,232] does not disclose an abrading structure comprising a plurality of ridge elements or other abrading elements configured to abrade skin. Instead, it appears that the various embodiments discussed and illustrated in Shadduck provide for the removal of a patient's dermal layers using abrasive crystals. In addition, Shadduck fails to teach or suggest a working end having an outer periphery that circumscribes or surrounds an abrading structure. (Exhibit P, at 51).

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS OPENING CLAIM CONSTRUCTION BRIEF**

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA  92647

Mr. Coleman explains that the file history shows a narrower definition than that proposed by the plaintiffs is appropriate.   The plaintiffs' construction, "is inconsistent with the file history which specifies that Shadduck does not teach an abrading structure and Shadduck would, necessarily wear away at least some trivial amount skin by mechanical action.  An abrading structure, therefore is more than merely a structure that can wear away with mechanical action.   The defendant's construction is consistent with the file history." Coleman Decl., ¶ 44.

### 13.    Claim 1 – Second Claim Term

The claim term, "a plurality of ridge elements, wherein said ridge elements are configured to abrade skin" should be constructed as, "edges that extend outward from the skin interface which remove more skin tissue than an esthetician that is conducting a superficial exfoliation."

The specification explains, with reference to the figure below, "The skin interface has a series of primary ridge elements 255a and valley elements 255b together the secondary notches or grooves 260 as defined above with similar dimensional parameters. This embodiment differs however in that the apexes of ridge elements 255a are substantially a sharp edge as are the edged of the notches 260." (Exhibit O, at 15, col. 7, ln. 43-47).



Mr. Coleman points out that application of the plaintiffs' construction is too broad resulting in the '716 patent device being anticipated by the '232 patent. Coleman Decl., ¶42-47.

/ / /

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA  92647

DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
OPENING CLAIM CONSTRUCTION BRIEF

### 14.   Claim 11

The claim term, "a plurality of abrading elements configured to abrade skin, wherein each abrading element comprises a sharp edge" should be constructed to mean, "a plurality of elements such that each element has a sharp margin of intersection to form a cutting edge that inflames, breaks, irritates or cuts the skin located below the epidermis beyond the reach of an esthetician that is conducting a superficial exfoliation."

Mr. Coleman explains that, "the cutting edge in Karkar [and] that of the '232 patent are structurally similar.   Both can remove some skin by rubbing, but abrading skin in this context means much more.   The abrasion necessary involves more than superficial exfoliation [.]   This abrasion requires a cutting edge that is formed from the sharp margin of intersection." Coleman Decl., ¶ 48.

Again, the plaintiffs' proposed construction is indistinguishable from the '232 patent because it omits the inventive structure of the claim rendering the '716 patent device anticipated by the '232 Patent if plaintiffs' definition is applied.

### F.   U.S. Patent No. 8,337,513

The '513 patent is a continuation of the '886 patent, which, as noted above is a continuation of the '591 patent. (Exhibit R, p. 12 col. 1 ln. 7-10).   The '513 patent makes the same impermissible recapture attempt as the '120 patent and the '886 patent.   (Exhibit S. p. 96).   All of the waivers and limitations of the file histories '591 patent and the '886 patent apply to the '513 patent as well. *Hakim*, 479 F.3d, at 1317-1318.

### 15.   Claim 1

The claim term "at least one sharp edge configured to abrade skin" should be constructed to be, "a sharp margin of intersection forming a cutting edge that inflames, breaks, irritates or cuts the skin located below the epidermis beyond the reach of an esthetician that is conducting a superficial exfoliation…."

/ / /

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA  92647

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
OPENING CLAIM CONSTRUCTION BRIEF**

The claims as originally presented were cancelled after a rejection in view of the '185 patent (Exhibit D) and the '078 patent (Exhibit I). (Exhibit S, p. 80). The new claims were allowed, according to the examiner because, "especially the aperture and the abrading structure are circumscribed within an outer circumference contacting a skin so that the vacuum source will effectively suck away the skin debris through the at least aperture." (Exhibit S, at 26).

Plaintiff has proposed the construction, "at least one edge that is sufficiently sharp to abrade skin and is arranged in a way that will allow it to abrade skin." Mr. Coleman explains, "[t]he difficulty is that Grinberg [the '185 patent] has the opening which has an edge that can remove some trivial amount of skin as the examiner notes at page 145 in the file history. Further, the grit tip on Bays ['078 patent] can abrade skin as well. The plaintiff's construction does not distinguish the Grinberg and Bays reference, though the plaintiffs stated these references were different [from the claimed invention] in the file history." Coleman Decl., ¶ 53. Plaintiffs construction is impermissible pursuant to *Festo Corp. supra*.

### 16.    Claim 10

The term, "selectively abrade skin" is not defined and is not found in the specification or drawings as originally filed in the '591 patent. Mr. Coleman explains, "If I were going to create a definition for this, I would say that it means a very small surface area of skin is removed whereas immediately adjacent skin is not abraded." Coleman Decl., ¶ 54.

The claim element, "at least one surface element configured to selectively abrade skin" should be constructed to mean, "at least one tooth that is created by a primary surface element and a secondary surface element with a valley therebetween." The specification support for this is the same as set forth in IV.E13, *infra*. The plaintiffs suggest "at least one element arranged in a way that will allow it to abrade a selected area of skin." Mr. Coleman emphasizes, "The problem is that this is what the Bays reference ['078 patent] is doing and the applicant said

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS**
**OPENING CLAIM CONSTRUCTION BRIEF**

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA 92647

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA 92647

that Bays is not teaching an abrasive structure." Coleman Decl., ¶ 56. The plaintiffs' construction does not align as well as the defendant's construction with the prosecution history.

### G.   U.S. Patent No. 9,468,464

The '464 patent is a continuation of U.S. Patent Application 13/620,164 ("the '164 application") which currently pends.   The '164 application is a continuation application of the '513 patent.   The '513 patent is based on a divisional application of the '886 patent.  The '886 patent is a continuation of the '591 patent as noted above. (Exhibit T, at 14, col. 1 ln. 6-13).  The '464 patent makes the same impermissible recapture attempt as the '120 patent and the '886 patent.   (Exhibit U, at 52-53).   All of the waivers and limitations of the file histories '591 patent, the '886 patent, and the '513 patent apply to the '464 patent as well. *Hakim*, 479 F.3d, at 1317-1318.

### 17.   Claim 1

The claim limitation "activating the vacuum source to simultaneously deliver a treatment media to the skin surface through the at least second port, wherein the treatment media comprises a liquid, and to aspirate spent treatment media through the at least one first port and the at least one passageway, thereby selectively providing a volume of the treatment media to the skin surface of the subject" should be constructed to read, "activating the vacuum source to simultaneously: 1. deliver a treatment media to the skin surface through the at least second port; and 2. aspirate spent treatment media through the at least one first port and the at least one passageway; using the vacuum source to control the following: providing a first volume of the treatment media to the skin surface of the subject; and providing a second volume of the treatment media to a location other than the skin surface of the subject."

/ / /

/ / /

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
OPENING CLAIM CONSTRUCTION BRIEF**

The latter part of this claim limitation was added to traverse a rejection based on U.S. Patent No. 6,193,589 issued to Khalaj ("the '589 patent"). (Exhibit V). The examiner believed that this addition was the inventive step and explained in the reasons for allowance, "the prior art of reference has failed to disclose or suggest a method for using a handheld device to treat a human skin comprising positioning the handheld device against a skin surface, activating a vacuum source to simultaneously deliver a treatment liquid, to aspirate the spent treatment liquid and to facilitate delivery the treatment liquid to a subsurface skin tissue." (Exhibit U, at 19). The applicant's interview summary relating to this amendment notes that the constructed limitation was discussed as an inventive step. (Id. at p. 112). Mr. Coleman explains the difference between the claimed invention and Khalaj ["the '589 patent"]: "The difference between the constructed claim limitation and Khalaj is that the vacuum in the '464 patent is pulling the media both into the nozzle and out of the nozzle at the same time whereas Khalaj is using a pump to deliver media and a vacuum to remove media." Coleman Decl., ¶59.

The claim indicates that a selected amount of media is delivered to the skin. Seemingly the rest goes elsewhere. Mr. Coleman explains, "The defendant sees it differently, proffering that the vacuum is controlling how much media is being dispensed to the skin surface and how much is going someplace else, presumably being sucked up by the suction port and never contacting the skin surface. The defendant has the better interpretation because it distinguishes the vacuum performing the function of a fluid media pump from using a pump and vacuum as disclosed in Kalaj. Specifically, Khalaj [the '589 patent] has a flow restrictor that is controlling the flow of media, the vacuum works with the flow restrictor, but they are different structure. The plaintiffs' claim construction defines what Kalaj is doing and not what is shown in the specification." Coleman Decl., ¶61.

/ / /

/ / /

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
OPENING CLAIM CONSTRUCTION BRIEF**

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA 92647

### 18.    Claim 12

The claim element, "activating the vacuum source to simultaneously deliver a treatment media to the skin surface through the at least second port, and to aspirate spent treatment media through the at least one first port, thereby selectively providing a volume of the treatment media to the skin surface of the subject, wherein the treatment media comprises a liquid" should be constructed to mean, " activating the vacuum source to simultaneously: 1) deliver a treatment media to the skin surface through the at least second port; and 2) aspirate spent treatment media through the at least one first port and the at least one passageway using the vacuum source to control the following: providing a first volume of the treatment media to the skin surface of the subject; and providing a second volume of the treatment media to a location other than the skin surface of the subject." This is for the same reason as set forth in Section IV.G17.

### H.    U.S. Patent No. 9,550,052

The '052 patent is a continuation of U.S. Patent 9,474,886, which is not asserted in this case.   U.S. Patent 9,474,886 is a continuation of '089 patent. (Exhibit W, p. 30, col. 1. Ln. 7-10). The '052 patent makes the same impermissible recapture attempt as the other patents above.  (Exhibit X. at 65).  All of the waivers and limitations of the file histories of the '089 patent apply to the '052 patent as well. *Hakim*, 479 F.3d, at 1317-1318.

The claim limitation, "wherein, when the vacuum source is activated and the tip contacts the skin surface, a suction force is created within the waste conduit and along the tip, thereby removing waste from the skin surface via the waste conduit while drawing treatment material from the first fluid container or the second fluid container to the tip via the supply conduit" should be interpreted to mean, "wherein, when the vacuum source is activated and the tip contacts the skin surface, a suction force is created within the waste conduit and along the tip; the suction force simultaneously: 1) removes waste from the skin surface via the waste

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA  92647

conduit; and 2) draws treatment material from the first fluid container or the second fluid container to the tip via the supply conduit…."

The examiner explained in the reason for allowance that the inventive step here was, "when the vacuum source is activated and the tip contacts the skin surface, a suction force is created within the waste conduit and along the tip, thereby removing waste from the skin surface via the waste conduit while drawing treatment material from the first fluid container or the second fluid container to the tip via the supply conduit." This limitation was important because Coleman (2001/0049511) taught a fluid discharge pump and vacuum combination substantially like the '589 patent above. (Exhibit AA, at 10 ¶¶50, 61). Therefore, the fluid discharge pump and vacuum are not the inventive step of '052 Patent.

The plaintiffs' construction does not emphasize that one vacuum is performing two tasks at the same time 1) drawing and 2) removing. The removal is more than incidental or trivial removal that might occur in conjunction with a pump because it would anticipated by Coleman. The examiner noted the identicalness of the pump system in the '052 Application and Coleman. *See* Exhibit X at 27. Defendant's construction aligns with the file history because it defines a pump system which is not anticipated by Coleman. Coleman Decl., ¶ 66.

## IV.   CONCLUSION

The Defendant's respectfully request that the 18 contested limitations be interpreted as provided in this paper.

Dated: June 4, 2018                    PLAGER SCHACK LLP


BY:  */s/  Mark Plager, Esq.*
MARK PLAGER, Esq.
MICHAEL SCHACK, Esq.
MICHAEL O'BRIEN, Esq.
Attorneys for Defendant

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA  92647

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
OPENING CLAIM CONSTRUCTION BRIEF**

# PROOF OF SERVICE

I am employed within the County of Orange, State of California. I am over the age of eighteen years, and not a party to the within action.   My business address is: Plager Schack LLP, 16152 Beach Blvd., Suite 207, Huntington Beach, CA 92647.  On **June 4, 2018**, I served the within documents:

## DEFENDANT AESTHETIC SKIN SYSTEMS LLC'S MEMORANDUM IN SUPPORT OF ITS OPENING CLAIM CONSTRUCTION BRIEF

☒   by transmitting via electronic mail the document(s) listed above to the email address(es) set forth below on this date before 5:00 p.m.

☐   by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☒   by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in United States mail in the State of California at Huntington Beach, addressed as set forth:

**Brenton R. Babcock, Esq.**
**Ali S. Razai, Esq.**
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA   92614

☐   by placing a true copy thereof enclosed in a sealed envelope, at a station designated for collection and processing of envelopes and packages for overnight delivery by **FedEx** by U.S. post office as part of the ordinary business practices of Plager Schack LLP described below, addressed as follows:

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

/ / /

/ / /

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA 92647

1

2         I declare under penalty of perjury under the laws of the State of California

3     that the above is true and correct.

4         Executed on June 4, 2018, at Huntington Beach, California.

5

6

7     _____

8               FIONA ANN COSTELLO

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAGER SCHACK LLP
16152 Beach Boulevard, Suite 207
Huntington Beach, CA 92647

-2-
**DEFENDANT AESTHETIC SKIN SYSTEMS LLC'S RESPONSES TO PLAINTIFF, EDGE SYSTEMS
LLC'S SECOND SET OF REQUEST FOR PRODUCTION OF DOCUMENTS AND THINGS**